COMMONWEALTH vs. WILLIAM TEWKSBURY.

The *St.* of 1845, *c.* 117, which imposes a penalty on "any person who shall take, carry away or remove any stones, gravel or sand, from any of the beaches in the town of Chelsea," was passed for the purpose of protecting the harbor of Boston, and extends as well to the owners of the soil as to strangers; but it is not such a taking of private property and appropriating it to public uses, within the meaning of the Declaration of Rights, art. 10, as to render it unconstitutional and void, although no compensation is therein provided for the owners.

SHAW, C. J. The defendant was indicted for taking and carrying away a quantity of sand and gravel from a beach in the town of Chelsea, contrary to the provisions of *St.* 1845, *c.* 117, which are in these words: "Any person who shall take, carry away or remove, by land or by water, any stones, gravel or sand, from any of the beaches in the town of Chelsea, excepting," &c., "shall, for each offence, forfeit a sum not exceeding twenty dollars, to be recovered, by complaint or indictment, in any court of competent jurisdiction." The defendant, not denying the taking and carrying away of the gravel, contrary to the terms of the act, rested his defence on two grounds. 1st. That he was owner of the land in fee, and that the statute did not intend to prohibit the owner from taking gravel from his own land. 2d. That if the statute did so prohibit the owner, for any purpose of public benefit, from taking gravel from his own land, it was a taking of the land for the public use, within the meaning of the Declaration of Rights, art. 10, viz. that no part of the property of any individual can be taken from him or applied to public uses without making him a reasonable compensation therefor; and inasmuch as the statute made no provision for compensation to the owner, it was unconstitutional and void.

The judge, before whom the trial was had in the municipal court, having ruled against the defendant, and the defendant having been convicted, he filed his bill of exceptions, and these questions of law now come before this court for revision.

The statute, though recent, is a mere revision of a former

one, *St.* 1798, *c.* 73; (2 Special Laws, 283;) they are alike in substance and purpose, and the only change is, in substi-tuting an indictment for a *qui tam* action, as the mode of prosecution. The object of both is apparent, and is a very important one, to protect the harbor of Boston, by preserving the integrity of the beaches, and the natural embankments of sand and gravel by which it is bordered.

1. Does the act extend the prohibition to the owners of the soil? In terms, it certainly does. "Any person" who does the act is made liable to the penalty. And we can perceive no ground on which an exception can be implied. The ob-vious purpose of the legislature was, to prevent the natural embankments from being broken up, and that, by prohibiting the removal of the sand and gravel composing them, by any body. If done by an owner, the damage would be as great as if done by a stranger.

The argument on this part of the case was this; that if gravel were taken by a stranger without the consent of the owner, it would be a trespass as to him, and the intent of the legislature probably was, to declare the private tort a public one, and subject the trespasser to a penalty to the public, in addition to his liability for damages to the owner. But we see nothing in the statute from which to infer such an intent. It is as competent for the legislature, upon grounds of public policy, to declare an indifferent act injurious to the public, and prohibit it by penalties, as to do the same in respect to an act, which is at the same time tortious as against a private person. We can have no doubt, therefore, that it was the intention of the legislature to prohibit the owner, as well as all other persons, from breaking up and removing the beaches and gravel banks within the prescribed limits, whether they adopted the proper and constitutional means, and acted within their constitutional powers, in order to accomplish that intent, or not.

2. But the other and far the more important question is, whether such a law is a taking, or appropriation to public use, of the land of all those who own land bordering on the

seashore, within the meaning of the Declaration of Rights, and whether it is a law which the legislature have no constitutional and legitimate authority to make, without providing compensation for such owners.

The court are of opinion that such a law is not a taking of the property for public use, within the meaning of the constitution, but is a just and legitimate exercise of the power of the legislature to regulate and restrain such particular use of property as would be inconsistent with, or injurious to, the rights of the public.

All property is acquired and held under the tacit condition that it shall not be so used as to injure the equal rights of others, or to destroy or greatly impair the public rights and interests of the community; under the maxim of the common law, *sic utere tuo ut alienum non lædas.* When the injury is plain and palpable, it may be a nuisance at the common law, to be restrained and punished by indictment. As where one bordering on a navigable river should cut away the embankment on his own land, and divert the watercourse so as to render it too shallow for navigation. But there are many cases where the things done in particular places, or under a particular state of facts, would be injurious, when, under a change of circumstances, the same would be quite harmless. As the use of a warehouse for the storage of gunpowder, in a populous neighborhood, or for the storage of noxious merchandize, or the use of buildings for the carrying on of noxious trades, dangerous to the safety, health or comfort of the community. Whereas, in other situations, there would be no public occasion to restrain any use which the owner might think fit to make of his property. In such cases, we think, it is competent for the legislature to interpose, and by positive enactment to prohibit a use of property which would be injurious to the public, under particular circumstances, leaving the use of similar property unlimited, where the obvious considerations of public good do not require the restraint. This is undoubtedly a high power, and is to be exercised with the strictest circumspection, and with the most sacred regard to

the right of private property, and only in cases amounting to an obvious public exigency. Still, we think, the power exists, and has been long exercised in cases more or less analogous.

The right to restrain owners of land in towns from erecting wooden buildings, except under certain restrictions, has never been doubted, or, if it has been, the doubt has long since been removed. So of the like nature are all laws to regulate and restrain the erection and use of furnaces and steam engines, and buildings designed for carrying on dangerous or noxious trades.

The protection and preservation of beaches, in situations where they form the natural embankments to public ports and harbors, and navigable streams, is obviously of great public importance ; although on many parts of the coast the situation of the shores is such, that the removal of sand and gravel, by the owner, would not be of the least injury to any body.

The importance of such natural beaches, in a public point of view, may be estimated by the case of Plymouth Beach The port of that ancient town was protected by a narrow strip of land, extending in front of it. In consequence of cutting away the wood upon it, or from some other cause, it was washed away and broken through by the wind and sea, and the navigation was in danger of being wholly destroyed. Under these circumstances, the public, the government both of the United States and of this Commonwealth, took measures, at great expense, to restore the beach, by artificial means, to its original condition.

The regulation of particular beaches, imposing greater or less restraint upon the use of them by the owners, has been a subject of legislation from early times. Several of these acts, dating from periods anterior to the revolution, are to be found in the appendix to vol. 3 of the Special Laws. Some of these acts, and especially those of modern date, and those which prohibit the owner of land from using his herbage, either by mowing or grazing, do provide for a compensation to the owner, for the damage which he may sustain under the restraints of the act ; but many of them do not so provide    It

is extremely difficult to lay down any general rule, or draw a precise line between the cases where the restraint of the right of the owner is such that compensation ought to be provided, and where the regulation is such only as to prevent a particular use of the property from being a public nuisance. Without hazarding an opinion upon any other question, we think that a law prohibiting an owner from removing the soil composing a natural embankment to a valuable, navigable stream, port or harbor, is not such a taking, such an interference with the right and title of the owner, as to give him a constitutional right to compensation, and to render an act unconstitutional which makes no such provision, but is a just restraint of an injurious use of the property, which the legislature have authority to make.

*Exceptions overruled.**

*Pope*, for the defendant.

*S. D. Parker*, for the Commonwealth.

---

\* By *St.* 1846, *c.* 206, the *St.* of 1845, *c.* 117, was repealed as to part of said Tewksbury's beaches in Chelsea, and $500 were ordered to be paid to him out of the treasury of the Commonwealth, " as an indemnity for the loss suffered by him under the operation of said act, by reason of being unnecessarily debarred from the use of his land, for the purpose, as was intended, of securing the harbor of Boston.''